Lee, J.
The mode of suing in this case and the jurisdiction of the court have both been called in question but as I think upon insufficient grounds. The act in question is one necessarily affecting all the inhabitants of the district named who in respect of persons or property were liable to taxation under its provisions; and as they were many in number but had a common interest, it was allowable according to settled practice, for some to file a bill on behalf of themselves and the other inhabitants similarly situated seeking any relief to which they might all in common be justly entitled, although their individual’interests might be several and distinct. Calvert on Parties 28; Cockburn v. Thompson, 16 Ves. R. 321; Chancey v. May, Pr. in Chy. 592; Attorney General v. Heelis, 2 Sim. & Stu. 67, 1 Cond. Eng. Ch. R. 348; Gray v. Chaplin, 2 Sim. & Stu. 267, Id. 451; Blackham v. The Warden and Society of Sutton Coldfield, 1 Chy. Cas. 269; Mit. Pl. 137; Milligan v. Mitchell, 3 Mylne & Craig 72, 14 Eng. Ch. R. 72. And it would seem where a large number of persons are thus interested in a common subject and acts be done to the injury of the common right, the approval of the majority will neither excuse the wrong nor take away from the other parties their remedy by suit. Bromley v. Smith, 1 Sim. R. 8, 2 Cond. Eng. Ch. 5. See also Sto. Eq. Pl. § 107, 112, 114, 120; Taylor v. Salmon, 4 Mylne *87 & Craig 134, 18 Eng. Ch. R. 133, opinion of Lord Cottenham; Wallworth v. Holt, Id. 619; 1 Dan. Ch. Pr. 287, et seq.
Nor is the jurisdiction of the court of equity in such a case more difficult to be maintained. It may be that for each act of the board of commissioners affecting the inhabitants of the district, every one who is aggrieved might have a remedy at law of some sort, more or less effectual, but the remedy in equity would be far more perfect adequate and complete, and as the acts of the commissioners would be in their nature continuing and to be renewed from time to time, to restrict the parties to their legal remedies would be to consign them to interminable litigation and involve endless multiplicity of suits. Hence the court of chancery will interpose by its injunction to prevent the threatened wrong and provide a remedy which shall at once reach the whole mischief and secure the rights of all both for the present and the future: and its jurisdiction in such cases would seem to be well defined and fully sustained by authority. Mit. Pl. 89, et seq. 117; Sto. Eq. Jur. § 33, § 437; Hughes v. Trustees of Modern College, 1 Ves. R. 188; Shand v. Aberdeen Canal Company, 2 Dow. Par. R. 519; Agar v. Regent's Canal Company, Coop. Eq. R. 77; Gardner v. Trustees of Newburgh, 2 John. Ch. R. 162; Belknap v. Belknap, Ibid. 463; Osborn v. U. S. Bank, 9 Wheat. R. 738; Charles River Bridge v. Warren Bridge, 6 Pick. R. 376; Crenshaw v. Slate River Company, 6 Rand. 245; Goddin v. Crump, 8 Leigh 120.
These difficulties being overcome, we are brought to the merits in the front rank of which stands the question raised as to the validity and legal operation of the act of assembly in question. This has been denied upon two grounds: First: because the legislature has no power under the constitution to make the operation of a law depend upon the result of a vote of the peo *88 pie or a portion of them. Second: because it cannot delegate the power of taxation to a board such as that created by the act for the purpose specified.
T¡jere js certainly no express inhibition in the constitution upon the provisional mode of legislation adopted in this case. The fourth article contains various restrictions and qualifications of the legislative power, and prescribes certain rules which the general assembly is required to observe in the exercise of its appropriate functions and the enactment of laws, but there is nothing which directly forbids the legislature to make the operation of an act dependent upon a vote of the people thereafter to be taken or other future'contingency. The objection however is that it is inconsistent with the representative principle and the theory of our government, in transferring the power and duty of making the law directly to the people or a portion of them, and thus relieving the representative body of their proper duty and just responsibility.
It will not be questioned that it is entirely competent for the legislature to provide for taking a vote of the people or of any portion of them upon a measure directly affecting them, and if a given number be found in favor of its adoption to enact a law thereupon carrying it into effect. And there would seem to be but little difference in substance in a reversal of the process by first enacting the law in all its parts but providing that its operation is to be suspended until it be ascertained that the requisite number of the people to be affected by it were in favor of its adoption. In regard to many measures especially those of a local character, it might be eminently just and proper that before they should be actually enforced the wishes of a majority or some other proportion of those who are to bear the burdens and reap the benefits, if any, should be ascertained in some *89 reliable form. And it would be upon some occasions a great saving of valuable time especially under a system of biennial sessions of the legislature, if the may be inverted and the act be first framed and submitted to the forms of enactment and the question as to its acceptance be subsequently determined upon by thosé interested.
It will be conceded that the legislature may provide that an act shall not take effect until some future day named or until the happening of some particular event or in some contingency thereafter to arise or upon the performance of some specified condition. The exigencies of the government may frequently require laws of this character and to deny to the legislature the right so to frame them would be unduly to qualify and impair the powers plainly and necessarily conferred. Accordingly we find this a familiar feature in the legislation both of the national and state governments. The constitution of the United States was submitted by resolution of the convention, to congress and to the delegates of the different states in convention assembled, for their assent and ratification, with a further resolution declaring it to be the opinion of the convention that the proper steps should be taken to execute the constitution as soon as it should be ratified by nine of the states. By the ordinance of the 13th of July 1787 erecting the territory northwest of the Ohio the governor and judges were to adopt and publish such laws of the original states as were necessary and best suited to the circumstances of the district which were to be in force until the organization of the general assembly therein unless disapproved by congress. The validity and effect of this provision was affirmed both in the Supreme court and in the Court of errors of New York in-a case involving the right of the government of the territory of Michigan, which was erected in 1805 out of part of *90 the northwest territory with a government similar in all respects to that established by the ordinance of 1787, to incorporate a banking company. Bank of Michigan v. Williams, 5 Wend. R. 478 ; S. C. in error, 7 Wend. R. 539. The nonintercoorse acts of March 1,1809, May 1,1810, and May 2, 1811, were expressly made to depend upon the course that might be adopted by England and France with regard to the edicts promulged by them, to be made known by proclamation of the president. And the principle of this mode of legislation was sustained by the Supreme court. Brig Aurora v. United States, 7 Cranch’s R. 382. See another illustration, Gray v. State of Delaware, 2 Harring. R. 76. Nothing is more common than for an act of assembly to be made to commence upon a future day. The Code of 1849 is an instance of the kind. All acts of incorporation are in effect acts to take effect upon a future event, the acceptance of the corpora-tors ; for without their consent the corporate body cannot be created. 3 Kent’s Com. 277. The various acts making subscriptions on the part of the state to works of internal improvement when a certain amount shall be raised by private subscriptions, are of this character. The several acts authorizing the Baltimore and Ohio rail road company to construct their road through the territory of Virginia contain the same feature. Such was the character of the act of March 3, 1835, which authorized the County courts to dispense with the first and second sections of the act in their respective counties and reinstate the road law of 1819. Such also was the act of February 3, 1846, accepting the county of Alexandria upon its retrocession. Instances of the same kind might be multiplied indefinitely.
Now if the legislature may make the operation of its act depend on some contingency thereafter to happen, or may prescribe conditions, it must be for them *91 to judge in what contingency or upon what condition the act shall take effect. They must have the power to prescribe any they may think proper; and if condition be that a vote of approval shall first be given by the people affected by the proposed measure, it is difficult to see why it may not be as good and valid as any other condition whatever. There can be no inherent vice in the nature of such a condition which shall serve to defeat the act when it would be legal and effectual if made to depend upon some other event. To say in such a case that the act is made by the voters and not by the legislature is to disregard all proper distinctions and involves an utter confusion of ideas upon this subject. Wherever the contingency upon which a law is to take effect depends upon the action of third persons, it might be said with equal truth that the law was enacted by those persons instead of the legislature. But there is a plain distinction between the act to be done by the voters and the legislative function. They have no power to alter or amend the act or substitute something else in its place. When it passed the assembly with the forms and in the mode prescribed by the constitution, the legislative function was exhausted although by its terms it required a vote of approval by the people interested before it went into operation., But when that vote was given and the result ascertained in the mode prescribed, the act became as operative and effectual as if it had simply fixed upon that day for its commencement. That its operation should depend upon the result of the vote is as much a part of the legislative will as any other of its provisions, and there can be no difference in principle depending on the nature of the event or contingency upon which the act is to take effect though the differences in kind and degree may be without end.
That there can be nothing in the contingency of a *92 vote of approval of an act by the people which shall serve of itself to nullify and defeat it is well by the numerous instances to be found in ^he legislation both of the general and state governments in which that feature is presented. By the act of assembly of the 3d of February 1846 before referred to, provision was made foy the reannexation of the county of Alexandria to this state “so soon as congress should by law recede to the commonwealth of Virginia the said county of Alexandria.” By the act of congress of the 9th of July 1840 provision is made for submitting the question of retrocession to a vote of the qualified electors of the county : and it was enacted that if a majority should be against accepting the provisions of the act, it should be void and of no effect; but if a majority should be in favor of accepting, it was to be in full force. And in that event it was made the duty of the president to inform the governor of Virginia of the result of the election and that the act was consequently in force. The constitutionality of neither of these laws has'' so far as I am informed ever been questioned; and indeed the case of McLaughlin v. The Bank of Potomac, 7 Gratt. 68, must have proceeded upon the concessum, that both were constitutional. By the schedule attached to the constitution of 1830, the general assembly was to provide by law for submitting the same to the voters thereby qualified for their ratification or rejection and for organizing the government under it in case it should be ratified. And by the act of February 12, 1830, provision is made both for a vote of the people and for the organization of the government and the election of senators and delegates under the amended constitution in case the same should be so ratified. By the constitution of 1851 a similar provision is made for submitting the same to the people for their ratification or rejection, and in the event of ratifica *93 tion, for the election of officers under the new constitution and the organization of the government. The general provision in the Code of 1849 (ch. 82) for schools is upon the principle complained of here, authorizes a vote to be taken in any county upon the petition of one-fourth of those entitled to vote in the election of delegates, by order of the County court, and if two-thirds of the votes be in favor of adopting a free school system, it prescribes the measures to be taken for carrying the same into effect. Code of Virginia, ch. 82, § 2, et seq. p. 376, 377. The provision for subscriptions on behalf of a county to a work of internal improvement, is upon a similar principle. It authorizes a vote of the freeholders of the county to be taken by order of the County court, and if three-fourths are found in favor of the subscription, provides for making the same and the means of paying the quotas. Code, ch. 62, § 38, 40, 42, p. 324, 325. These general provisions but adopted the principle of submitting the subject to a vote of the people from numerous special acts which had passed from time to time for particular counties and districts and particular works of improvement. And this principle has been adopted and sustained in other states. Thus by an act of the legislature of Pennsylvania, an election by qualified voters of two certain townships was directed to be held in order to determine whether one of the two which had been created out of part of the other should be continued or annulled, the question to ' be determined by a majority of the votes polled. An election was held and a majority of the votes was given against the continuance of the new township. This act was held to be constitutional. Commonwealth v. Judges of Quarter Sessions, 8 Barr Pa. R. 391. So a law establishing a new county which was to be submitted to the vote of those on whom the burdens were to fall was decided to be not unconstitutional. State *94 of Missouri v. Scott, 17 Missouri R. (2 Bennett) 521. So an act concerning the removal of the seat of justice of Delaware county, which provided that the question Qf £jle remoyaj should first be submitted to a vote of the qualified electors and if a majority should be found in its favor, the commissioners should designate the location for the new public buildings and proceed to erect them, was held to be valid and constitutional. Commonwealth ex rel. Lyons v. Painter, 10 Barr Pa. R. 214. So an act of the legislature of Kentucky which authorized the mayor and council of the city of Louisville with the consent and approbation of a majority of the qualified voters of the city expressed by a vote at a regular election of city officers and upon a regular submission of the question after due notice, to subscribe for stock in the Louisville and Frankfort rail road company, was sustained. Talbot v. Dent, 9 B. Mon. R. 526. In Steward v. Jefferson, 3 Harring. R. 335, a law authorizing taxation for the purposes of free schools by. the determination and vote of a majority of the voters of a school district was decided to be constitutional. A similar law was sustained in Maryland. Burgess v. Pue, 2 Gill’s R. 11. The case of Bridgport v. Housatonic Rail Road, 15 Conn. R. 475, was upon a similar principle and the act in question was maintained to be valid. In Slack v. Maysville and Lexington Rail Road Company, 13 B. Mon. R. 1, the -power of the legislature of Kentucky to impose local taxation for local purposes and its right to employ the agency of County courts, trustees of towns, and other bodies created for the purpose, are fully maintained; and it was held to be no objection to the mode of exercising it that it was referred to the vote of a majority of those to be affected by it. Accordingly the provision of the act incorporating the company which made it the duty of the mayors and councils of the cities of Maysville and Lexington and
/ *95 of the County courts in certain counties to ascertain the sense of a majority of the qualified voters within their respective limits, and if a majority should be favor of subscriptions to the stock, to make the same and to levy taxes or borrow money to raise the necessary amounts was held to be within the legitimate powers of the legislature. And in a case which went before the Supreme court of New York, the very question was decided in the most imposing form. The act of that state of March 26, 1849, known as the “ free school law” provided (§ 10) that the electors should determine by ballot at the annual election whether the act should or should not become a law. By section 14 it was provided that if a majority should be found against it, the act should be null and void; but if the majority should be for the law, the act should become a law and take effect on a day specified. It was objected that the effect of the act was to transfer the power of enacting laws from the legislature to the electors at the ballot box. The court however distinguished between the exercise of legislative power in framing and enacting a statute which is to become a law, and the exercise of another altogether different and foreign but subordinate power in producing the event or result upon which such enactment is to take effect; and held the act in question to be valid and constitutional. Johnson v. Rich, 9 Barb. R. 680. Other cases will be found to the same effect or asserting a similar principle in several of the states.
I am aware there are cases to be found in the reported decisions in some of the states in which the contrary doctrine has been maintained. Several have been cited by the counsel for the appellants. • One of these is the case of Rice v. Foster, 4 Harring. R. 479. This appears to be a leading case as it is cited in all the other cases which I have seen in which the decisions have accorded with it, and the line of argument *96 adopted in it seems to be very much the same as that which led to the conclusion in the subsequent cases. The act in question provided for taking a vote of the citizeng 0f the several counties upon the question of licensing the sale of intoxicating liquors : and if there should be a majority of votes for “no license” it was declared to be unlawful for any person to retail intoxicating liquors within any county which had given such majority, and the retailing such liquors was declared to be a nuisance. The court held the act null and void because it was a delegation of legislative power to the people which it was said the legislature had no power to make. But it will be observed that the court carefully distinguish this case from Steward v. Jefferson (above cited) in which it was held that the legislature might properly leave it to a majority of the school voters to say whether a tax should be laid for the establishment of free schools. This case was approved, but the distinction in principle between it and Rice v. Foster, has eluded my perception, though the court in the latter case seem to think- it very apparent. However this znay be the utmost ingenuity will fail to distinguish it from the case in j udgznent and the authozúty of the decision in the one case and of the opinion of the court approving it in the other, may both be cited here in support of the arguznent.
The case of Parker v. Commonwealth, 6 Barr Pa. R. 507, was upon a similar law of the state of Pennsylvania, and the case was decided in the sazne way as in the Delawai’e case, and upon very similar reasoning. And yet it will be seen that Judge Bell who delivered the opinion of the majority of the court (two of the judges dissenting) fully sustains the constitutionality of the school law of 1836, one of the provisions of which was that elections should be held at stated periods within each district at which the question of establishing common schools should be decided by the *97 qualified voters of the district. If a majority should be “ for schools” the directors were to go on and establish them according to the provisions of the act: but if the majority should be “for no schools,” system was not to go into operation for a certain period. And if after a district had accepted the system a majority of the voters should be against its continuance (to determine which elections were to be held) it was to be suspended till a majority should otherwise decide. Like Chief Justice Booth in the Delaware case, he distinguishes between such a law and the excise law of which he was treating and which he regarded as but a transfer to the people at the polls of the power to enact a penal statute under which the citizen might be indicted and punished. The authority of this case even on the question which it decides, is however much shaken by the subsequent cases of the Commonwealth v. The Judges of Quarter Sessions and the Commonwealth v. Painter (above cited,) although it may not have been directly and in terms overruled. In these cases the court has plainly receded.from the ground attempted to be maintained in Parker v. Commonwealth, and both are strong authorities in support of the validity of the act in question here. \
The doctrine of Rice v. Foster appears to have been applied to laws concerning free schools in two cases in New York. They are Thome v. Cramer, 15 Barb. R. 112, and Bradley v. Baxter, Ibid. 122. I will not stop to distinguish the law in question in those cases from our act, because whatever respect may be due them, I yet think in point of authority they are far outweighed by the cases establishing a different doctrine. The reasoning of the judges tends rather to demonstrate the inexpediency of this provisional legislation than its unconstitutionality, and to my mind it is far less cogent and convincing as to the latter than that which pre *98 vailed in Johnson v. Rich, in which the same law was sustained by the same court although with a different of judges.
wjS(jom an¿ expediency of this kind of legislation, this is not the place to express an opinion. To say that it is liable to be abused is but to affirm what is equally true of every mode of legislation. Whilst there may be occasions on which it may be adopted with advantage to the public interest, it may also be resorted to upon others to enable the representative to escape from his just responsibilities. Yet however profoundly impressed the judicial mind may be in any given instance with its impropriety and inexpediency, it will not do to say that for that cause the law may be set aside. This would but be for the judiciary to set itself up as a revisory body upon the acts of the general assembly and would be a plain usurpation upon the powers conferred upon that body. Unlike a question of constitutionality proper which must depend upon fixed principles, this would fluctuate with the varying views of different minds. What one judge might deem most unwise and dangerous another might think highly proper and beneficial. How great soever the evil may be the security against it must be sought in the wisdom and integrity of the legislative body or failing these, the corrective will be found in the virtue and intelligence of the people.
The second ground of objection to the act is equally unsustainable. The maxim potestas delegates non potest .delegari however true in the abstract can have no application here. The authority of the legislature to delegate to other bodies the power of taxation for certain purposes can no longer be considered an open question. As early as in the time of Judge Pendleton this court decided that the power of laying levies for county purposes might well be conferred upon the *99 county courts. Case of the Fairfax County Levy, 5 Call 139.* So the constitutionality of the act of the 13th February 1833 authorizing the council of the city of Richmond to subscribe to stock of the James river and Kanawha company and to levy taxes to provide for the subscription was maintained. Goddin v. Crump, 8 Leigh 120. Judge Brooke who dissented from the opinion of the majority of the court in that case, agreed however that the legislature might delegate its power to local authorities for local purposes: and this doctrine was again affirmed in the case of the Harrison Justices v. Holland, 3 Glratt. 247, and receives support from decisions elsewhere. Burgess v. Pue, 2 Gill R. 11; Livingston v. Mayor of New York, 8 Wend. R. 85; Thomas v. Leland, 24 Wend. R. 65 ; Lockhart v. Harrington, 1 Hawks’ R. 408 ; Cheaney v. Hooser, 9 B. Mon. R. 330 ; Nichol v. Mayor &c. of Nashville, 9 Humph. R. 252; Slack v. Lexington and Maysville R. C. 13 B. Mon. R. 1. And it may now be regarded as definitively settled. Nor can any distinction be successfully maintained between the local municipal purposes for which the power of taxation has thus been held to be duly delegated and the support of a district or county free school system. The board of commissioners is a purely local authority and the education of those entitled to admission may also be regarded as sufficiently local in its character to come within the strictest interpretation of the rule, and surely no purpose' for which the power may be exercised can be more laudable or more conducive to the public weal.
*100 I feel therefore no hesitation in coming to the con-c^usi°n that the act in question was perfectly within constitutional competency of the legislature, and ag pag {jeen ascertained in the mode prescribed that ^ie re(lu^s^e number of votes was given for its acceptance, it is to be respected and enforced as any other act of the general assembly passed in conformity to the constitution.
Upon the construction of the act several questions have been made which I will now briefly consider.
. It is insisted that.no power is given to the commissioners to levy taxes for school-houses and that they have transcended their authority in so doing. It is true the act does not say in terms that the commissioners may levy a tax to pay for school-houses, but it authorizes them to establish schools and after ascertaining the amount necessary to defray the expense to levy taxes for the same. To establish schools, the first step must be to provide school-houses; and it cannot be supposed that the act contemplated these would be furnished by private contributions. Nor could it have been the intention of the act that the system should not take effect unless school-houses should be so furnished. Had such been the intention it would doubtless have been plainly expressed. There is no reason for supposing that the omission to provide in express terms the power to build or purchase schoolhouses was intentional with the view of withholding that of levying taxes for that purpose. It was doubtless not expressly conferred because it was thought to be embraced sufficiently in the general powers given to the board. And if it be conceded that the act should receive a strict construction, still it must be such as to enable the board to carry the intention of the legislature into effect. This was to establish free schools and to do this the power to provide schoolhouses was indispensable. Upon the familiar principle *101 therefore that a power expressly granted carries with it by necessary implication all such as are required for its due and proper exercise, the power to provide necessary school-houses may well be maintained.
It is also objected that the commissioners have adopted a mode of taxation unauthorized by the act. The capitation tax levied by them was upon the white male inhabitants over the age of twenty-one years only: and the property tax was an ad valorem tax upon all the property in the district excepting slaves, and upon these was laid a tax of fifty cents for every hundred dollars worth of those above the age of twelve years, every such slave to be valued at three hundred dollars no tax at all being imposed on slaves under that age. These discriminations it is insisted the board had no power to make.
It must be supposed that it was the intention of the legislature the act should be perfect and complete in all its parts and capable of being executed without further legislation. Now while the ninth section provides for a capitation tax, nothing is any where said of the means by which the number and names of those who would be subject to it are to be ascertained. No provision is made for obtaining a list and no one authorized to require parents or heads of families to give the numbers of those who would answer the description of “ white male inhabitants.” And it can scarcely be supposed that it was the intention of the legislature the capitation tax which the act authorized should be levied on infants of what age soever, as well as upon adults. Certainly a doubt may well arise upon the construction of the ninth section as to the precise class intended to be embraced by the terms “ white male inhabitants” upon whom this capitation tax was to be laid, and reference may properly be had to the constitution under which the law was enacted in aid of its interpretation. By the twenty-fourth section of the *102 fourth article of the constitution, a capitation tax, eo nomine, is required to be levied on every white male who has attained the age of twenty-one yearS) one moiety of which is to be applied to education in primary and free schools. It may therefore reasonably be inferred that it was the intention of the legislature the capitation tax authorized by this act should conform to that required to be levied by the constitution and should be laid upon the same class of white male inhabitants, to wit, those of the age of twenty-one years and upwards. Thus the number and names of those who were subject to the capitation tax authorized by this act would be found upon the books of the commissioners of the revenue of the county as listed for the purpose of the capitation tax required to be imposed by the constitution : and to these books in the absence of any provision for making a list, reference may and must be had to enable the commissioners to ascertain the amount of liabilities incurred and fix the rate of the tax to be imposed. The names and number of the white male inhabitants resident within the district would perhaps be found in common with those resident throughout the whole commissioner’s district; but it would be the duty of the commissioners to discriminate those resident within the limits of the district from those without.
So with regard to the tax to be laid on property. No provision is made for any assessment of property within the district nor any mode or means prescribed for ascertaining the amount and kinds liable to taxation. Besort therefore must be again had to the books of the commissioners of the revenue. But the constitution declares a particular class of slaves only to be subject to taxation, to wit, those of the age of twelve years and upwards and it also prescribes the ratio in respect to land in which they shall be assessed. So that the commissioner’s books made out for state pur *103 poses would only exhibit the number of slaves to be assessed with taxes under the constitution: and it is therefore reasonably to be intended that the term “ property” where it occurs in the ninth section used as it respects slaves, in the sense affixed by the constitution and that the slaves embraced by it are those only who have attained the age of twelve years, each to be assessed with a tax equal to and not exceeding that imposed on land of the value of three hundred dollars. It has been made by the constitution a feature of state policy that the ad valorem property tax when applied to slaves should be in a fixed ratio and according to an assumed standard of value, and any act of assembly providing for levying taxes ought to be regarded as intending to respect this policy and not to enlarge the area of taxation unless the contrary be plainly and expressly declared.
The capitation tax provided for in the twenty-fourth section of the fourth article of the constitution is to be equal to the tax assessed on land of the value of two hundred dollars. But this is a tax which the legislature is required to levy. It may not be less than according to the ratio prescribed, but there is nothing to prevent the legislature from making it greater; and it can scarcely be doubted that it is strictly within the power of the legislature to increase this tax according to its discretion for the promotion of education and any other legitimate purpose: and this power it may delegate to the County courts or to a corporation such as that created by this act for the purposes of education to be by them exercised as it might be by the legislature, with such additional guards and restrictions as that body shall see proper to impose. Hence it was competent to the board to fix the capitation tax at a higher rate than that provided in the constitution, and as education is perhaps more fitly and appropriately the subject of a capitation tax than of a tax on *104 property (although property also is undoubtedly interested and shoüld contribute its justproportion) there be good reason why the board in the exercise of y.g ¿igcre-fcion advanced the capitation tax beyond the general ratio and made it relatively larger than the state tax prescribed by the constitution. And I do not feel prepared to say that in fixing its amount the board have abused their power or unduly exercised their discretion.
None of the objections which have been made should as it seems to me be sustained: and I am of opinion to affirm the order dissolving the injunction.
Allen, P. and Moncure, J. concurred in the opinion of Lee, J.
Daniel and Samuels, Js. thought that the commissioners erred in exempting from taxation any of the white males or slaves. On the other questions they concurred in the opinion of Lee, J.
Decree affirmed.

 Note by the Judge. — The date of this decision and the occasion on which it was made do not appear. The opinion was however furnished to the reporter by Judge Pendleton himself and it was no doubt a decision of the Court of appeals in his time. That eminent judge died in October 1803.