Lee, J.
The regularity of the proceeding by injunction in this case although discussed by the counsel for the appellant in his opening argument, was not controverted by the attorney general. He was under *424 stood to concede that it is a proper mode by which to test the legality of a levy made by an officer under the supposed authority of a law the constitutionality of which is denied. Upon this point therefore I shall content myself with referring to the cases of Qoddin v. Crump, 8 Leigh 120; and Bull, Sfc. v. Read, 13 Gratt. 78, and authorities there cited. It might perhaps admit of more question whether a court of equity would as a matter of course in such a case as this interfere by way of injunction to restrain the act of an officer, not because the constitutionality of the law under which he is proceeding is called in question, but because the existence of any such law is absolutely denied. Upon this question' however I think it may be unnecessary to express any opinion.
The commonwealth being the party substantially interested in the subject matter of controversy, it might have been more regular under the provisions of the act entitled an act regulating the jurisdiction of the Circuit courts, passed May 22, 1852 (Sess. Acts 1852, p. 58, § 3), that this suit should have been originally instituted in the Circuit court of the city of Richmond in order that the commonwealth might be duly represented by the proper officer, and such officer should of course have been made a party defendant. As however the suit was subsequently removed to that court in conformity to the provisions of § 8 of ch. 46 of the Code,.p. 239, and the auditor of public accounts who had been made a party by an amended bill, duly appeared and filed an answer, all difficulties as to parties and the regularity of the hearing before the Circuit court of Richmond city, may be considered as overcome, and we may proceed to consider the case upon its merits.
The object of the bill was to test the legality of the levy made by the sheriff of Northampton upon the property of the appellant to enforce payment of-the *425 tax claimed to be due to the commonwealth under the several provisions of law imposing a tax upon the transmission of estates by devise or descent to any - other person or use than those specified, and prescribing also the rate of the same. The provisions under which the tax was claimed to be due are those of ch. 35 of the Code, § 10 and § 42, p. 179, 184, and of ch. 39, from § 6 to § 12, inclusive, p. 214, 215, and the act entitled an act imposing taxes for the support of government, passed March 2, 1854, § 15; and the legality of the sheriff’s proceeding was denied because as it was alleged, the several provisions of law above cited including the fifteenth section of the last named act, were unconstitutional, inoperative and void. And in the argument here, the further ground was taken by the counsel for the appellant, that in point of fact when this levy was made, there was no law upon the statute book authorizing or requiring such a levy to be made, the act of March 2, 1854, having expired or been replaced by the act of March 18, 1856, which contained no provision for a tax upon a subject of this character.
It has always been considered to be a most delicate office for a judge to undertake to pronounce an act of the legislature to be unconstitutional and void. It is substantially to repeal the obnoxious law and thus in effect to exercise a power properly belonging to another department of the government. “ The question (says Judge Marshall), whether a law be void for its repugnancy to the constitution is at all times a question of much delicacy, which ought seldom if ever, to be decided in the affirmative, in a doubtful case.” “It is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers and its acts to be considered as void. The opposition between the constitution and the law must be such that the j udge feels a clear and *426 strong conviction of their incompatibility with each other.” Fletcher v. Peck, 6 Cranch’s R. 87. “ The - question whether a law is in accordance with the constitution (says Judge Brooke), is at all times a very delicate and important question.” “ It should not be in a doubtful case that the acts of that body (the legislature) should be decided by the courts to be unconstitutional.” Sharpe v. Robertson, 5 Gratt. 518, 642. “ The duty of enquiring into and deciding upon the legal validity of an act of the legislature has always been regarded by this court, and justly, as one of the most delicate it can be called upon to discharge.” Per Daniel, 'J. in S. C. p. 574. Where a plain and palpable infraction of constitutional provision is shown in a law upon the validity of which it is called upon to decide, it is of course one of the highest and most solemn duties of the court to declare such law to be inoperative and void. If however it be only upon slight implication or inconclusive reasoning that the supposed infraction can be made out, the court should never undertake to rescind and annul the solemn and deliberate act of the legislative department of the government. To doubt in such a case should be to affirm.
There is certainly one proposition which will not be questioned, and that is that the legislature possesses the full, absolute, sovereign power of taxation, excepting so far as it may have been surrendered to the general government or may be interdicted by the constitution of the United States, or as it may be controlled by the restrictions and mandates of the constitution of the state. See City of Richmond v. Daniel, not yet reported, opinion of Samuels, J. And this power it is most important should be sustained and upheld as essential to the very existence of the government of the state, and as providing the means for vindicating her sovereign authority. See Providence Bank v. Bil *427 lings, &c. 4 Peters’ R. 514; Weston v. City Council of Charleston, 2 Peters 449. We do not go to our constitution to see what powers of taxation are given to the .legislature but to ascertain what restrictions and limitations upon its general sovereign power are imposed by its provisions. If therefore the power to tax any subject whatever is not excluded by the terms of the constitution or by necessary and inevitable implication, it must exist in the general assembly to be exercised at the discretion of that body as wisdom and a proper sense of justice shall direct.
The counsel for the appellant does not controvert this position, but he insists that the particular tax in question though not expressly and in terms prohibited by the constitution, is yet as effectually prohibited by the most necessary implication from its provisions as if the power to impose it had been expressly denied. He insists that it is in effect purely a tax on property, or if it is not to be regarded as a tax on property but on a benefit or privilege to the citizen, that the power to impose it is excluded because it is not enumerated amongst those authorized to be imposed by the twenty-fifth section; and whether a tax on property or privilege it is equally violative of the twenty-second section of the fourth article of the constitution which declares that taxation shall be equal and uniform throughout the commonwealth. He also maintains that if it is to be considered a tax on property, it conflicts with the provision of the twenty-second section which declares that all property other than slaves shall be taxed in proportion to its value and with the twenty-third section of the same article regulating the taxation of slaves.
If this tax were properly to be considered as a tax on property, there would be great force in the argument of the counsel. As the ordinary annual tax had been assessed upon the decedent, this would then ap~ *428 pear to be a second taxation of the same subject, with the additional assessment upon all the slaves of whatever age and at their real value. But such, I think is not its true character. It cannot be regarded in a proper legal sense as a tax upon property. The property tax which the framers of the constitution were contemplating in the twenty-second section was the ordinary annually recurring tax for the support of government laid upon all property whatsoever. They had no reference to casual subjects of taxation occurring irregularly and occasionally which though connected with property were yet readily to be distinguished in their essential character and features. If the tax imposed had been a fixed and arbitrary sum, it would scarcely have been said to be a tax on property although every tax for which the property of the tax payer is liable might be called a tax on property in a certain sense. But the argument is that as the tax is a certain per centum of the value of the estate and the property pays it, it is therefore a tax on the property itself. But this is by no means a necessary logical conclusion. The intention of the legislature was plainly to tax the transmission of property by devise or descent to collateral kindred; to require that a party thus taking the benefit of a civil right secured to him under the law should pay a certain premium for its enjoyment; and as it was thought just and reasonable that the amount of the premium should bear a certain proportion to the value of the subject enjoyed, it is fixed at a certain per centum upon the value of the whole estate transmitted. And of this surely there can be no just complaint; on the contrary it would have been unequal and unjust to^require that a party receiving an inconsiderable property should pay as high a premium as one who takes a large and valuable estate. It is perfectly in accordance with the principles of natural justice and the spirit of the constitution that *429 the tax upon such a subject should be regulated in strict proportion to the value of the benefit which it secures.
The case of Brown, &c. v. The State of Maryland, 12 Wheat. R. 419, was cited by the counsel. In that case it was held that the prohibition in the constitution of the United States to the states to lay duties or imposts on imports or exports, prevented them from requiring the importer to take out a license and pay a tax before he could be permitted to sell the articles by the bale or package; and that the requirement of such a license and tax before the importer could sell also conflicted with that provision of the constitution which declared that congress should have power to regulate commerce with foreign nations and among the several states and with the Indian tribes. The court considered that as the importer had paid the duty imposed by the act of congress, he thereby acquired the right not only to bring the articles into the country but also to dispose of them afterwards, that being the essential object of the importation and the motive for paying the duty. But I do not perceive how this touches the question in our case. It was not decided that a tax on the transitas of property and on the property itself, were one and the same; but it was held that both the right to import and the right to sell the merchandise after it was imported were secured to the importer by the payment of the duty imposed by the act of congress, the power of conferring both these rights having been appropriated to the general government by the constitution and necessarily therefore denied to the states.
The objection that the tax is not levied upon the heir or legatee but is to be paid out of the estate of the decedent, and that therefore it cannot be considered a tax upon the privilege of succeeding to the property, is I think more specious than real. Whether *430 the tax is paid by the personal representative before he turns over the estate to the party entitled or by the latter after he receives it, the effect is the same. It is in either case a premium paid for the right enjoyed and the value of the estate is exactly diminished by the amount of the premium. Nor does the manner in which the tax is spoken of in the Code and subsequent acts at all change its real character. It is spoken of as a tax on “ decedents’ estates,” but in immediate connection with their transmission under the statute of wills or the laws regulating descents and distributions; and the character of the tax is not to be fixed by any isolated words that may be employed, but they must be taken in the connection in which they are used and the true character is to be deduced from the nature and essence of the subject.
That the general assembly of Virginia in the absence of a constitutional prohibition does possess the power to tax a civil right or privilege like this is beyond all question. This is fully embraced within its general and comprehensive power upon the subject to which allusion has already been made. But it may be deduced from the very nature of the subject itself. The right to take property by devise or descent is the creature of the law and secured and protected by its authority. The legislature might if it saw pi'oper, restrict the succession to a decedent’s estate, either by devise or descent to a particular class of his kindred, say to his lineal descendants and ascendants; it might impose terms and conditions upon which collateral relations may be permitted to take it; or it may to-morrow, if it pleases, absolutely repeal the statute of wills and that of descents and distributions and declare that upon the death of a party, his property shall be applied to the payment of his debts, and the residue appropriated to public uses. Possessing this sweeping power over the whole subject, it is difficult to see upon what *431 ground its right to appropriate a modicum of the estate, call it a tax or what you will, as the condition upon which those who take the estate shall be permitted to enjoy it, can be successfully questioned. That the tax is confined to collateral inheritances and devises to others than those specified, presents no difficulty. It is the will of the legislature to make this discrimination and its discretion upon the subject must be regarded as having been duly and properly exercised.
Assuming then that this is a tax upon a civil right or privilege, which the legislature may impose if there be no prohibition in the constitution, we are to enquire whether there be any such prohibition. None certainly in terms is to be found in that instrument, but it has been argued that as it is not one of the subjects named in the twenty-fifth section, the power to impose it is excluded by necessary implication, upon the principle expressio unius exchtsio cst alierius. But this argument would prove too much, for it would sweep away the taxes on deeds, suits, notarial seals and that class of subjects, the constitutionality of which has never been questioned by any one. It would restrict the whole power of taxation to the particular subjects named in the twenty-second and three following sections. But this surely could not have been designed by the framers of the constitution. If those four sections had been entirely omitted no one can doubt that the legislature would have had full power to tax all the subjects to which they relate. The three first of these were plainly not intended to confer a power of taxation; they prescribe rules by which the power already supposed to be possessed by the legislature shall be exercised. The language of the twenty-fifth section is somewhat different and might seem to be permissive in its character; but the section seems *432 rather to be introduced for the purpose of imposing a restriction than of conferring a power. All property was to be taxed ad valorem, and taxation was to be equal and uniform; but if it should be deemed expedient to tax incomes and licenses, the property from which the income was derived and the capital invested in the business for which the license was required, were to be exempted. Or it may have been thought that as all property was to be taxed a doubt might arise whether a tax on incomes and licenses could be substituted for one on the property or capital, and therefore the particular language was used to remove such doubt and show that the legislature had an election as to which of the subjects should be made to bear the tax. Why “ salaries” was also named may not be so apparent. It may be that it was intended by just implication to exclude the power to tax the office or employment from which the salary proceeded and the salary itself. Or it may be that as “ incomes” had been mentioned, it was thought the kindred subject of “ salaries” should also be made to exclude any conclusion from its omission that the power to tax them was not intended to be exercised by the legislature. And thus that the section was intended to make a qualification and to remove doubts, but not to tie up the hands of the legislature so as to restrict the power of taxation to the property tax, capitation tax, and tax On incomes, salaries and licenses. But however this may be it seems to me that where a general sovereign power exists to be exercised at the pleasure of the legislature over numerous different subjects, it would be very unwise and unsafe to hold that because a few of those subjects may have chanced to be named for some particular purpose or in some particular connection in the instrument which is intended not to confer but to restrict its powers, therefore all others were impliedly *433 excluded. To my mind there is not that necessary and inevitable implication which alone can supply the place of an express and positive prohibition.
If the power of taxation then was intended to be exercised over other subjects than those named in these sections, it is not surprising that in their number this tax should have a place. It is a tax of great antiquity having been imposed upon the Romans as early as the days of the Emperor Augustus. It was adopted by various nations of Europe, and together with the tax on transfers of property among the living, constituted in ancient times according to a learned writer, one of the principal branches of the revenue of the feudal crown. See Smith's Wealth of Nations, p. 387, et seq. In modern times, it is in some shape or other a tax of frequent imposition, and that it was not introduced into our system at an earlier day was perhaps only owing to the fact that the exigencies of the treasury had not sooner required a resort to other subjects of taxation than those previously adopted. It was first imposed, I believe, by the act of 1843-4, and at the late revisal of 1849 was re-enacted as a regular and permanent tax. And at the first session of the general assembly after the new constitution was adopted and when the cotemporaneous history of that instrument must be supposed to have been fresh in the memory of the law makers, it was recognized as a valid existing subject of taxation and the rate fixed at which it was to be levied.
If this tax is not to be regarded as a property tax, the counsel concedes that the ad valorem principle cannot be applied to it, and therefore that it is not within that provision of the twenty-second section nor those of the twenty-third section; but he ai’gues that every tax of what nature soever is within the principle of equality and uniformity prescribed in the *434 twenty-second section, and that this tax is violative of that provision.
I think it may well be questioned whether all the provisions of the twenty-second section are not to be confined to taxes on property. The argument to show that the principle of equality and uniformity was intended to apply to them alone is at least strong and persuasive. The cotemporaneous history of the constitution proves that this section grew out of the supposed antagonism between the eastern and western portions of the state in respect of the slave property so predominant in the former. Had the interests of all portions of the state been uniform and homogeneous, the principle of representation would have afforded adequate protection to the tax payer against injustice and oppression, and no such provision would have been introduced. As they were deemed otherwise, a guarantee was demanded, and the controversy was adjusted by the concession of the provisions of the twenty-second and twenty-third sections. See Gilkerson v. Frederick Justices, 13 Gratt. 577, opinion of Samuels, J.; Slaughter's Case, Id. 767, 775, opinion of same judge. Now the reason of these sections cannot extend to subjects as to which no discrepancy of interests exists. This discrepancy is in the matter of property alone, and there can be no sectional difference in respect of devises or descents to collaterals any more than there can be in respect of incomes, salaries, notarial seals, and the like.
A similar provision is to be found in the constitutions of several others of the states, and the same terms “ equal and uniform” are employed in most of them. In the constitutions of Tennessee, Louisiana, Arkansas, Massachusetts, Illinois, Texas, Wisconsin, Michigan and California, the rule of equality and uniformity is enjoined either in terms or by equivalent *435 'expressions, and in giving them construction, it has been held in several of the states, that the terms “ equal and uniform” apply only to a direct tax on property, and that the clause by which such equality and uniformity is prescribed does not limit the power of the legislature as to the objects of taxation, but is only intended to prevent an arbitrary taxation of property according to kind or quality without regard to i value. ■ Hence specific taxes have been sustained as a valid exercise of the legislative power. Portland Bank v. Apthorp, 12 Mass. R. 252; Sawyer v. City of Alton, 3 Scamm. R. 127; People v. Dorr, Same v. Hussey, cited in Sedgwick on Stat. & Constit. Law, 558, n; Aulanier v. The Governor, 1 Texas R. 653; Sedgwick 554, et seq.
In view then of the construction of these terms which has prevailed elsewhere, and bearing in mind the particular reason which led to the adoption of the twenty-second and twenty-third sections, the inference -is strong that property only was in the mind of the framers of the constitution ; and it is further strengthened by the fact that although incomes and salaries as well as property of assessable value may be brought under the rule, yet there is a large class of subjects, such for example as licenses, which do not admit of a tax strictly equal and uniform in the sense contended- for; and thus the constitution is to be made to conflict with itself, and a large and important branch of the revenue is to be cut off, because it cannot be brought within the .rule of exact equality and uniformity. It is true the language used is broad •enough to cover every thing, and if it be conceded that the rule must apply to all subjects, yet as remarked by Judge Samuels in Slaughter's Case, 13 Gratt. 767, it can only be so applied so far as practicable. If a given subject be only susceptible of a modified application of the principle, it must réceive 'this, and not be rejected because the rule cannot be *436 applied with perfect precision to its whole extent and in all its results. See Aulanier v. The Governor, above cited, p. 660.
In this view I do not perceive wherein the inequality and want of uniformity complained of can be said to consist. To say that the decedent’s estate is charged with the regular annual tax and then with the additional tax on the transmission to his collateral heirs or devisees, and thus charged with taxes greater than those imposed on other citizens, is but to repeat the argument that it is a property tax which I have already considered. The tax is equal and uniform, throughout the state as far as it is susceptible of the application of the rule. It is the same every where upon the succession to estates of equal value of whatever subjects they may consist. Every person, every where, who takes by this succession, pays a tax for the privilege, and this tax is proportioned to the value of the interest which he acquires. But in this, it is said, there is a want of uniformity; that unlike the tax on deeds, seals and the like, it is not fixed at a sum certain, the same to all, but varies according to the value of the estate taken. In other words that the legislature in seeking to carry out the principle of equality as far as practicable have destroyed that of uniformity. I think there is no force in the objection. To such subjects as deeds, seals, &c. it may be that the principle of equality cannot be applied. The legislature have thought so ; certainly they have not attempted to apply it. But to the succession to property, as between those who constitute the class of such beneficiaries, the application is easy and simple, and the legislature have sought to make it by fixing the tax at a certain per centum upon the property acquired; and have in this mode as far as practicable carried out the rule of equality and uniformity. Nor does the exemption where the estate is of less value than two hundred *437 and fifty dollars constitute a necessary departure from it. The legislature may define the class to which this tax shall be restricted as they in their discretion may think just and proper, taking care to render it uniform with all those who constitute the class; or as they are authorized to exempt any particular subject from taxation, it maybe regarded as an exemption in favor of those entitled to inconsiderable estates “of less value than the sum named: and we must take it that the adoption of the tax as it stood in the Code, after the new constitution, amounted to an exemption by the constitutional majority of all those falling under the minimum prescribed.
But it is said that the principle of taxation in cases like this is of dangerous tendency and inadmissible, because, if allowed, the legislature may under the form of taxing transfers and sales of slaves between the living, impose taxes to any amount whatever upon that species of property, and thus break down the guaranty which it was the intention by the compromises of the constitution to afford to the eastern people against injustice and oppression. It is the argument oft repeated of the possible abuse of power, and may be urged with equal truth of any power whatever possessed by the legislature, however indisputable or how indispensable soever its exercise may be for the public welfare. Any power wielded by mere human will may be 'abused. For myself, I do not question the power of the legislature, by requiring a license or otherwise, to impose a tax upon the sale of slaves, any more than I do that of imposing a tax upon the sale of cattle or any other property or a tax on stamps, if the exigencies of the public finances should be such as in their opinion to render a resort to such a source of revenue necessary, whatever might be my opinion as to the wisdom and policy of imposing burdens of this character. But the power to impose such a tax *438 is one thing; the expediency and propriety of its exercise is another and a very different thing. The legis- ■ lature has seen proper to lay a tax upon the alienation of real estate, for such in effect is the tax upon deeds, and I have never heard its constitutionality called in question. The possibility that the general assembly may be influenced by sinister, improper or unworthy motives in the passage of any law, is, I think, utterly inadmissible as a correct basis of judicial action. When we speak of their power we are to do so, as said by ■ Ch. J. Parker, “presuming that it will never be exercised but for wise or necessary purposes.” Portland Bank v. Apthorp, 12 Mass. R. 252. We do not sit here to review the manner in which the legislature has exercised its discretion, but to declare when it has plainly transcended its constitutional powers. The guarantee for just, wise and wholesome legislation is to be sought in the intelligence and integrity of the members composing the legislative body and in their immediate responsibility to their constituents.
It remains to consider the ground taken for the first time in the argument here, that in point of fact there was no law in existence at the time of the levy of this tax which authorized or required it to be made. There is no suggestion of this kind in the bill, and if it were true, the sheriff in thus acting without any authority would be a trespasser and liable to the action of the aggrieved party for damages. As however the case has been bona fide instituted and brought up to this court upon the constitutional question, it may not be improper to deeide this question also and thus put an ' end to the litigation between these parties.
This tax was declared by the Code (ch. 85) and made a part of the permanent system of taxation. By chap. 40, the rates of assessment on the different subjects of taxation are fixed and prescribed. The Code took effect on the 1st of July 1850 and at the following session of *439 the legislature no tax bill was passed and that of the.' Code remained in full operation. At the session in 1852 a temporary bill was passed fixing the rates of taxation for one year and this tax was rated at two per. centum of the estate transmitted. By this act ch. 40 and § 1 of ch. 39 of the Code were repealed. At the session of 1852-3 a general tax bill was passed which unlike that of the session of 1852 was not limited in its operation to any year or years. By this act the tax upon this subject was fixed at the same rate of two per centum of the value of the estate, and the 40th chapter of the Code was again repealed, as was also the 1st section of the 39th chapter. At the session of 1853-4, the same tax was repeated and the same chapter and section of the Code were again repealed. In the act passed at the session of 1855-6, no rate is fixed for this tax. Why it was omitted whether by inadvertence or design we are not informed. But although by the act entitled an act concerning the assessment and collection of the public revenue, passed April 7, 1853, and by the several acts above recited, various chapters and sections of the Code on the subject of taxation are expressly repealed, yet no where is there found any clause repealing the 10th and 42d sections of chapter 35, or either of the sections from the 6'th to the 12th, inclusive of chapter 39, which are the sections imposing the tax in question. And the act of the 7th of April 1853 distinctly recognizes those sections as permanent provisions of the revenue laws of the commonwealth.
Now the testator died in June 1855 and the tax immediately thereon accrued to the commonwealth although the collection could not be enforced until the following year, and it was the duty of the sheriff to proceed to collect it in 1856 according to the rate prescribed by the act of March 2, 1854, notwithstanding the legislature had omitted to fix any rate in the tax *440 law of March 18, 1856. The failure of the legislature to fix a rate in 1856 without any repeal of the previous laws prescribing the tax and fixing its rate could not operate as a release of the tax accrued in 1855. The provisions of the Code and of the act of March 2, 1854, are permanent provisions and must remain in force until they are expressly repealed or replaced by other provisions plainly intended to be substituted in their stead. The mere omission to fix a rate upon a particular subject will not operate as a repeal of previous laws prescribing the tax, but it will be left still in force at the rate prescribed by the previous law, if there are no expressions showing clearly that the legislature intended the tax to be discontinued. And if the testator had died in 1856 instead of 1855,1 incline to think that the tax would have accrued and should be collected according to the rate prescribed by the act of 1854; though upon this point it is perhaps unnecessary to express an opinion.
I think the Circuit court did not err in dissolving the injunction and am of opinion that the order be affirmed.
Allen, P. and Samuels, J. concurred in the opinion of Lee, J.
Daniel and Moncure, Js. dissented.
Decree affirmed.