42  641
28a 443
42  641
83  673
42  641
e91 139
91  604
91  621
36a 252
38a 58᧒
38a 658
38a 670

L. T. Blessing and others v. The City of Galveston.

1. **Injunction against collection of taxes.** In an ordinary case involving the validity of a tax, either State or municipal, on constitutional or other grounds, which may be considered and determined by the court just as consistently with public policy before as after its collection, and especially where the rights of a large number of persons are involved, and a great number of suits may be avoided, and individual loss and damage prevented, courts may properly interpose by injunction to prevent the collection of such tax.

2. **Parties to such suits.** It is not objectionable for others having a like interest with the original plaintiffs to make themselves parties.

3. **Judicial knowledge.** As the Constitution makes no positive provision and furnishes no specific direction to ascertain what law is enacted by the other co-ordinate departments, or how, or when they are so enacted, it follows that the court does so from and by reason of its inherent judicial knowledge and power; hence an issue of fact, whether a particular bill has been passed by the Legislature in conformity with the constitutional provisions, will not be submitted to a jury.

4. **Statute law, how ascertained.** The courts will not disregard an Act of the Legislature because the Journals of one or both houses of Legislature fail to show its passage in strict conformity to all the directions in the Constitution, it being in other respects perfect and unobjectionable.

5. **Municipal corporations not contracts.** Public or municipal corporations established for public purposes, such as the administration of local or civil government, are not in the nature of contracts between the State and the corporation; but such corporate powers may be enlarged, or contracted, or destroyed, at the will of the Legislature.

6. **Assent of the people to a city charter.** Such assent is not necessary to the validity of a charter enacted by the Legislature; but if such assent was necessary the organization of the city government under the charter would evidence such assent.

7. **Legislative powers to grant charters to cities, with powers of taxation.** The power to create local municipal corporations is an essential incident of, and inherent in, the grant of legislative power

41

under our republican form of government, and while the Legislature cannot delegate its general legislative power, yet it is equally well settled, that it may confer on such corporations local legislative power adequate to the purposes of their creation.

8. MUNICIPAL TAX.   If such tax be in excess of the limits of the charter, the levy to the amount of such excess would be void.

9. ASSESSMENT OF TAXES.   See Texas Banking and Insurance Co. v. The State, supra.

10. OCCUPATION TAX.   Taxes levied upon trades and occupations are not prohibited by the Constitution.

11. MUNICIPAL OFFICERS.   From the power to create a municipal corporation would follow the right to invest it with such powers as are necessary and essential for the ends and purposes of its creation, such as general police powers, and the means of enforcing their respect and observance.

12. CITY RECORDERS.   The Constitution vesting judicial power in such inferior courts and magistrates as may be created in this Constitution, or by the Legislature under its authority, is sufficient to warrant the Legislature, in creating municipal corporations, to create municipal tribunals, as an essential necessity to the well-being of such municipal corporations.

APPEAL from Galveston.   Tried below before the Hon. A. P. McCormick.

On the 23d September, 1871, Solomon T. Blessing, Theodore B. Stubbs, F. W. Bartlett, Joseph Seitz, William B. Sorley, and John W. Wicks and James H. Trezevant, the two persons last named being partners under the firm-name of Wicks & Trezevant, filed in the District Court of Galveston county, their petition in behalf of themselves and all others of like interest, who might desire to become parties, in order to avoid a multiplicity of suits, and in their petition alleged, in substance, that the Act of 16th May, 1871, incorporating the city of Galveston, is an illegal, unconstitutional, and void act, and a pretended grant of a new charter to the city of Galveston, and not a law of the land, within the meaning of Section 16 of the Bill of Rights; and that said Act was not read on three several days in each house, while on its passage through the Legislature, as required by Section 24, Article 3, of the

Constitution, and the rule requiring every bill to be so read was not dispensed with by a vote of four-fifths of the house, and that when said Act was ordered to be engrossed, and passed to its third reading, it was considered, engrossed, and read, when no quorum was present.

The petition alleged further, that Article 7, Title 3, of the charter creating the Recorder's Court, is repugnant to and unauthorized by Section 1, Article 5, of the Constitution, and that the ordinance of the city of Galveston of July 5, 1871, divides citizens into different classes, and prescribes different rates of taxation on classes of persons pursuing the same occupation, and different rates for different classes, in violation of the rule of equality and uniformity of taxation prescribed in Section 19, Article 12, of the Constitution. That, under this ordinance, taxes differing in rate and amounts were imposed on persons pursuing the occupations in which petitioners (appellants) were engaged, and that, under said ordinance and charter, the Recorder of the city of Galveston was authorized to issue writs of arrest, and to fine and imprison all persons who failed or refused to pay said taxes. That writs of arrest had been issued by one John S. Rhea, as Recorder of the city, for the arrest and trial of petitioners before him as Recorder, under charges of not procuring from the city of Galveston licenses to pursue their respective occupations. Petitioners, alleging that they apprehended arrest and fine and imprisonment of themselves, prayed that the city of Galveston, its officers and agents, be enjoined from proceeding against them, and all others who might become parties plaintiff in this suit, either by way of arrest, trial before the Recorder, or the seizure and sale of their property, under pretense of authority under said charter or ordinance.

In response to the prayer of petitioners, Hon. James Masterson, Judge of the 19th Judicial District, ordered that the writs of injunction do issue as prayed for, upon the several complainants, respectively, executing their respective bonds, conditioned and payable as required by law, each bond to be

in double the amount of the tax alleged to be claimed by defendant—a municipal corporation—as due to said corporation under the ordinance annexed as an exhibit to complainant's bill.

On the 6th of November, 1871, a large number of persons, pursuing different occupations in the city of Galveston, taxed under the above-mentioned ordinance, gave each their bonds, in compliance with the fiat of the judge, and filed their petitions in this cause as plaintiffs therein, alleging the allegations in the original petition to be true, and that a large number of the petitioners therein were then under arrest, under writs of arrest issued by John S. Rhea, acting as Recorder of the city of Galveston, and joining in the prayer for relief, and submitting themselves to the judgment of the court. Under the original and supplementary petition, a writ of injunction, as prayed for, was issued from the District Court on the 7th November, 1871, and served on the Mayor of the city and other officers. On the 13th November, 1871, a similar petition was filed in this cause by a large number of other persons, their injunction bonds being filed at the same time, and under this petition a second writ of injunction was issued.

On the 9th December, 1871, a similar petition was filed by several other persons, but no writ of injunction was issued thereon.

On the 11th December, 1871, a similar petition was filed in the cause by one Henry Duebner, alleging that he was then illegally under arrest, and held for trial before the Recorder of the city, under a charge of selling spirituous liquors in quantities less than an ordinary wine bottle, without a license from the city of Galveston. His injunction bond being filed, a writ of injunction, similar to the writs before issued, was issued and served. The petitions, original and supplementary, were duly served on the Mayor and other officers of the city.

The petitioners were pursuing the following various occupations: Photographers, life insurance agents, merchants, bankers and dealers in exchange, commission merchants, hotel

keepers, dealers in carriages, buggies, etc., ship agents, coal dealers, auctioneers, merchandise brokers, keepers of restaurants, insurance brokers, keepers of bar-rooms, barber shops, venders of wood from their own wood-yards in the city of Galveston, physicians, lawyers, dentists, theatres, steamboat agents, persons engaged in transporting merchandise, tailors, shoemakers, ticket agents for railroad companies, owners of trucks for transporting merchandise and baggage, owners of vehicles or buggies kept for private use, and drawn by one horse, keepers of retail grocery stores where liquors were sold in quantities of not less than an ordinary wine bottle, and other occupations.

Petitioners refusing to pay the taxes imposed under ordinance of July 5, 1871, writs were issued by John S. Rhea, as Recorder of the city, for their arrest and trial before the Recorder's Court of the city, under the charges above mentioned.

Judgment for defendant, and plaintiffs appealed.

*Ben. C. Franklin & L. E. Trezevant,* for appellants, filed an able and elaborate argument, the length of which prevents its insertion.

They contended that the court erred in sustaining the ordinance of the city of Galveston of July 5, 1871, entitled, "An " ordinance to establish a uniform rate of license taxes on pro- " fessions, callings, and other business occupations, and on car- " riages, hacks, drays, and other vehicles," because the ordinance does not, as its title contemplates, impose a uniform rate of taxes, but imposes instead diverse and discriminating rates in violation of Sections 2, 16, and 21, Article 1, and Section 19, Article 12, of the Constitution of this State.

To use the language of Woodbridge *v.* Detroit, 8 Mich., 301, " To compel individuals to contribute money to the use of the " public without reference to any common ratio, and without " requiring the sum paid by one person to bear any relation " whatever to that paid by another, is, it seems to me, to levy a " forced contribution, not a tax, within the sense of that term, " as applied to the exercise of power by any enlightened or re- " sponsible government."

The Constitution of this State declares that—

" All freemen, when they form a social compact, have equal " rights, and no man, or set of men, is entitled to exclusive, " separate, public emoluments or privileges."

" The equality of all persons before the law is herein recog-" nized, and shall ever remain inviolate."

" To guard against transgressions of the high powers herein " delegated, we declare that everything in this Bill of Rights is " excepted out of the general powers of government, and shall " forever remain inviolate; and all laws contrary thereto, or to " the following provisions, shall be void."

Section 19, Article 12, declares that—

" Taxation shall be equal and uniform throughout the State. " All property shall be taxed in proportion to its value, to be " ascertained as directed by law."

" The Legislature shall have power to levy an income tax, " and to tax all persons pursuing any occupation, trade or pro-" fession, provided the term occupation shall not be construed " to apply to pursuits either agricultural or mechanical."

It will be observed that the great object sought to be secured by the people, when they framed this section of the Constitution, was equality and uniformity.

In providing for this great principle, the people, says Cooley, in his work on Constitutional Limitations, page 495, have done no more than to state in concise language a principle of constitutional law which, whether declared or not, would inhere in the power to tax.

It is clear, says Blackwell, on Tax Titles, page 7, that whenever the property of a citizen shall be taken from him by the sovereign will, and appropriated without his consent, for the benefit of the public, the exaction should not be considered as a tax, unless similar contributions be made by that public itself. This is in accordance with that well known maxim, that where the burden is common there should be common contribution to discharge it.

Every preson, says Kent, Vol. II., page 331, is entitled to

be protected in the enjoyment of his property, not only from invasions of it by individuals, but from all unequal and undue assessments on the part of government. It is not sufficient that no tax be imposed on the citizens but by their consent. The citizens are entitled to require that the Legislature itself shall cause all public taxation to be fair and equal in proportion to the value of the property, so that no one class of individuals, and no one species of property, may be unequally or unduly assessed.

Jean Baptiste Say, the great French politico-economist, says, " That system of taxation is best, or least bad, which presses " impartially on all. Taxation, being a burden, must needs. " weigh lightest on each individual when it bears on all alike."

Puffendorf, chapter 9, book 7, contains the following: " Since the subjects are obliged to the bearing of taxes, and " the like burdens, on no other account but as they are necessary " to defray the public expenses in war or peace, it is the duty " of sovereigns in this respect to draw no further supplies than " either the mere necessity, or the signal benefit and interest of " the State shall require. And then they are to see that these " impositions be levied according to the justest proportion, and " that no immunities or exemptions be granted to certain per- " sons to the defrauding or oppressing of the rest."

In Toledo Bank v. Bond (1 Ohio State Reports, 699), the court say, " It is an essential requisite of the taxing power, " that it should be so exercised as to apportion the burdens of " the government with equality and justice to all the members " of the community; and a law imposing unequal burdens of " taxation, oppressing some to favor others, is an abuse of " sovereign power, and a violation of that high trust by which " the power of taxation is delegated."

In Exchange Bank of Columbus v. Hines (3 Ohio State, 1), the court say, " It is with a view to this essential condition " (equality and justice), that any people consent to confer this " high civil function upon their government."

This rule cannot be expunged from the Constitution. The

people have written it down that the taxing power cannot be exercised but under its operation.

See the same point discussed in Exchange Bank v. Hines (3 Ohio State, 1).

In Gilmore v. City of Sheboygan (2 Black, 510), the court say, " The Court refer with approbation to the Exchange Bank " v. Hines," *supra*.

The Constitution of Wisconsin, Article 8, Section 1, declares, that " the rule of taxation shall be uniform, and taxes " shall be levied upon such property as the Legislature shall " prescribe."

" Its mandate, it is true," says the Supreme Court, in Knowlton v. Supervisors of Rock Co. (9 Wisconsin, 410), " is very " brief, but long enough for all practical purposes—long " enough to embrace within it clearly and concisely the doc- " trine which the framers intended to establish, to wit, that of " equality. The rule of taxation shall be uniform ; that is to " say, the course or mode of proceeding in the levying or lay- " ing taxes shall be uniform ; it shall in all cases be alike. The " valuation (of property) must be uniform, the rate must be " uniform. Thus uniformity becomes equality, and there can " be no uniform rule which is not an equal rule."

The Legislature cannot confer on the city of Galveston a power to tax which it cannot itself exercise (Cooley's Const. Limitation, 198).

(Parish of Orleans v. Cockran, 20 La. An., 373 ; Police Jury v. Nogues, 11 La. An., 739 ; Hunsaker v. Wright, 30 Ill., 146 ; City of Zanesville v. Richards, 5 Ohio State, 589 ; Knowlton v. Supervisors of Rock Co., 9 Wisc., 410 ; Weeks v. City of Milwaukee, 10 Wisc., 242 ; Marr v. Enloe, 1 Yerger, 452 ; Prim v. City of Bellville, Ill., Superior Court, from 4 Chicago—Legal News, 527, April, 1872).

It will be remembered that the subjects of taxation prescribed by the Constitution, are property, income, and persons pursuing occupations, trades, and professions, excepting agricultural and mechanical pursuits, being distinct subjects.

It will be noted that the last-named subject is nothing more nor less than the pursuit of an occupation, trade or profession by a person.  That it is in the nature of a poll tax; that property, income, or salary, forms no part of the subject; that the tax is to be imposed simply on all persons pursuing occupations, without reference to property, either in amount or kind, without reference to any income or capital that the persons may have, or may receive, or may employ in the pursuit of their occupations; that the tax is to be imposed without reference to personal skill or energy, to success or failure, or to the accommodations of a hotel, or to the amount of deposits in a bank, or stalls in a stable, since otherwise the tax would not be what it purports to be, an occupation tax, purely and simply, but would be either a property tax or an income tax, which it does not profess to be, or some anomalous tax yet unknown to political economy, and unauthorized by the Constitution.

It is to be observed, also, that the tax is to be imposed on all *persons*, not firms or associations of persons, since firms or associations of persons are not known to the Constitution as subjects of taxation.

It will be observed that the tax imposed by the ordinance of the 5th of July, purports to be a tax on persons pursuing occupations, except so far as it imposes a tax on carriages, drays, and other vehicles, which is a tax on property, and which, not being *ad valorem*, the Legislature has no power to levy, and of course cannot delegate such power to the city council.

By this ordinance merchants are divided into twelve different classes, each class being taxed by a different rate, some merchants being classed according to the amount of sales, some according to the kind of merchandise sold, some according to the class of persons to whom the merchandise is sold, some according to the mode and manner in which the merchandise is sold, some according to the time of commencing business.

Retail grocery stores are divided into two classes; commission merchants and produce brokers into four classes; dealers

in wood and charcoal into two classes, one class not being taxed; ticket or freight agents for railroad companies into two classes, one class not being taxed, being a discrimination in favor of agents for railroad companies located in this State; theaters into two classes; junk dealers into two classes, according to the amount of sales.

Tailors, shoemakers, and barbers, *mechanical occupations*, are taxed. The barber is taxed according to the number of his chairs.

The rate of taxation being in every instance determined by the classification.

Each vehicle and horse is taxed twice—first as property, in proportion to its value; secondly, by a specific and arbitrary tax.

The ordinance in question fixes unequal taxes upon persons pursuing the same occupation. It is therefore unconstitutional and void.

(Parish of Orleans v. Cockran, 20 La. An., 373; The State v. Merchants' Insurance Co., 12 La. An., 802; Police Jury v. Nogues, 11 La. An., 739.)

In People v. McCreery (34 Cal., 455) overruling People v. Coleman (4 Cal., 46), which followed the dicta in Aulanier v. The Governor (1 Texas, 653), the court say: " Nor can we subscribe to the proposition that the Legislature, at its discretion, may discriminate between different classes of property or citizens in the imposition of taxes.

In Crow v. State (14 Mo., 238), the court say: " Concede " this power to the Legislature, and the only instrument of " tyranny which is longer deprecated in the comparatively free " governments of modern times, receives an efficiency never " designed by our fathers, and too dangerous to be contem- " plated without the greatest solicitude."

As to equality and uniformity in taxation, see Marr v. Enloe, 1 Yerger, 452; Oliver v. Washington Mills, 11 Allen, 268; Mayor of Columbia v. Beasly, 1 Humph., 232; The State v. Eastabrook, 3 Nevad., 173; Lexington v. McQuillan's Heirs, 9 Dana, 512; Suttan's Heirs v. Louisville, 5 Dana, 512.

The city council has no power to transmute the right of pursuing the occupations in question into a privilege, to be enjoyed by those only who may pay the tax, or obtain a license on such terms as may be prescribed within the discretion of the city council.

It was contended (in Crow v. The State, 14 Mo., 237) that this license tax was a tax on the occupation of the merchant and not on his property.

The court held that the distinction was one of form and not of substance, and that a double *ad valorem* tax was imposed on the property of the merchant and grocer, and said:

" A tax of five hundred dollars' worth of property belonging " to one citizen, of one dollar, and a tax on the privilege of " holding, using and enjoying five hundred dollars' worth of " property by another citizen of the same amount, exhibits a " difference, if there be one, so impalpable and evanescent as " not to be clearly identified by language.

" In the case put above, it is the property in both instances ' which is looked to in fixing the tax.    The citizen finds one " exactly as heavy as the other, and has precisely the same re- ' sources out of which to pay it.    In the latter case it is assumed ' that the tax is imposed merely on the occupation, and yet it " is plain that if the license-taker had no property, he would " not only have had no tax to pay, but could not have received " a license."

As a tax on property, the tax in question is illegal, because:

*First.* Not assessed.

*Second.* The property is not taxed in proportion to its value.

*Third.* The tax is not equal and uniform.

The *ad valorem* tax levied under the ordinance of June 20, 1871, is one-fourth of one per cent. in excess of the limit prescribed by the Charter, and beyond the power of the city council. (See Charter, Article 1, Title 5 ; Dillon, Section 610, and cases cited.)

*C. B. Sabin* and *Walter L. Mann*, for appellee.

MOORE, J.  This suit was brought by appellant, Blessing, and some six or seven others on their own behalf, and on behalf of all others having a like and common interest, who might make themselves parties, to enjoin and restrain appellant from proceeding in prosecutions alleged to have been commenced by warrants issued by John S. Rhea, claiming to be acting as recorder, under pretense of authority alleged to have been conferred on him by an Act of the Legislature, incorporating the city of Galveston, on which warrants petitioners allege some of them were threatened with arrest, and others of them had been arrested, for breach of an ordinance requiring them to pay a license tax on their respective occupations, trades, and professions, and, also, to enjoin and restrain appellee from the collection of said license tax.  The injunction asked was allowed by the judge to whom the petition was presented.  And after it was filed, many others, who allege that proceedings had been, or were about being commenced against them, before said pretended recorder, for penalties for their failure to pay a like license tax on their respective occupations, appeared and made themselves parties, and gave bonds as required by the order of the judge granting the injunction.

Many questions of great general as well as local and individual interest are presented by the record, and have been discussed by counsel with consummate ability and with a research and learning which exhibits a thorough knowledge and complete mastery of the subjects which they involve.

The principal grounds upon which appellants rely for a reversal of the judgment, which need be considered by us at this time, resolve themselves into the following general propositions :

*First.* The Charter or Act, under and by virtue of which appellee claims to exercise corporate powers, is inoperative and void, and confers no corporate power or authority whatever upon appellee.

1. Because it was not passed by the Legislature in conformity with the directions of Section 24, Article 3, of the Constitution.

2. Said act of incorporation was not submitted to the citizens of the city of Galveston for their approval or rejection, but was attempted to be imposed upon them without their consent.

*Second.* The Constitution does not authorize the Legislature to delegate to the city of Galveston authority to levy and collect taxes from the people.

*Third.* The ordinance levying the tax claimed from appellants exceeds the power of taxation conferred on said city by its charter, and is in conflict with the constitutional restrictions regulating the levy and collection of taxes.

*Fourth.* The Recorder's Court created by the charter of the City of Galveston, in which the proceedings were had to enforce the penalties for failure to pay said taxes, is not such a judicial tribunal as is warranted by Section 1, Article 5, of the Constitution.

As preliminary to the discussion of the questions involved in these propositions, it will not be amiss, especially as it involves the *sole* ground upon which the injunction was granted by the judge to whom the petition was presented, to refer to an objection made by appellee on the hearing of the case in the District Court, and also urged before us as a ground why the judgment should not be reversed, viz.: This suit was brought to enjoin the collection of taxes with which a court of equity ought not to intefere, because it does not appear that any irreparable injury will accrue, and appellants have a full and complete remedy at law.

This proposition is unquestionably sustained by the weight of English authority, and has received the sanction of many American Courts of the highest character. But while we are willing to concede its correctness in a general sense, and freely admit that courts should not lightly interfere to restrain, by injunction, the collection of taxes either municipal or State, and should, indeed, if asked to enjoin taxes levied for general revenue, or when their interposition might lead to the embarrassment of the State, do so with the greatest circumspection, and only then in cases where it is plainly manifest it is their

imperative duty in the exercise of their equity powers, yet this rule is only applicable, we think, in such extreme cases as those indicated. In an ordinary case involving the validity of a tax, either State or municipal, on constitutional or other grounds, which may be considered and determined by the court just as consistently with public interest before as after its collection, and especially where the rights of a large number of persons are involved, and a great number of suits may be avoided, and heavy individual loss and damage prevented, we concur in the conclusion, supported, we believe, in number and weight, by the better considered American cases, that courts may properly interpose by injunction to prevent its collection. (13 Gratt., 78; 27 Geo., 354; 25 Iowa, 436; 38 Penn., 309; 58 Id., 338; 22 Ind., 262; 10 Id., 70; 30 Ill., 148; 20 Id., 357; 21 Mich., 498; 20 La. An., 450; 10 Wis., 242; 30 Conn., 404; 16 Ohio, 574; 6 McL., 142; 12 How., 567.)

Nor do we think there was any valid objection to other parties, having a like interest with the original plaintiffs, making themselves parties. (54 Ill., 240; 51 Id., 130; 7 Cold., 49; 24 Barb., 187.)

Section 24, Article 3, of the Constitution, says: " No bill " shall have the force of a law until on three several days it be " read in each House, and free discussion be allowed thereon, " unless, in case of great emergency, four-fifths of the house in " which the bill shall be pending may deem it expedient to " dispense with this rule. And every bill having passed both " houses shall be signed by the speaker and president of their " respective houses; *provided,* that the final vote on all bills " or joint resolutions appropriating money or lands for any pur- " pose shall be by yeas and nays." Section 17 of the same article reads: " Each house shall keep a journal of its own pro- " ceedings, and publish the same; and the yeas and nays of the " members of either house, on any question, shall, at the desire " of any three members present, be entered upon the journals." Section 25, of Article 4, requires: "Every bill which shall have " passed both houses of the Legislature, shall be presented to

"the Governor for his approval.    If he approve he shall sign
"it, but if he disapproves he shall return it with his objections
"to the house," etc., etc.    And Section 26, same article, says:
"Every order, resolution, or vote, in which the concurence of
"both houses shall be required, except the question of adjourn-
"ment, shall be presented to the Governor, and must be ap-
"proved by him before it can take effect; or being disapproved
"shall be re-passed in the manner prescribed in case of a bill."

Substantially similar provisions are to be found in the Consti-
tutions of most of the States, and have elicited much judicial
as well as political discussion, resulting in marked divergent
and conflicting opinions and conclusions.    We are only inter-
ested with those of a judicial character.    A bill does not be-
come a law, or order, resolution, or vote take effect, until it has
undergone the consideration and final action of both the legis-
lative and executive departments, although it may not neces-
sarily receive the sanction of the latter.    The judicial depart-
ment has no participation with the other departments in mak-
ing or enacting laws; but to it is entrusted the sole duty of ad-
ministering them.    And as the Constitution makes no positive
provision, and furnishes no specific direction how it shall ascer-
tain what law is enacted by the other co-ordinate departments,
or how or when they are so enacted, it follows that it does
these solely from and by reason of its inherent judicial knowl-
edge and power.    It is evidently, therefore, an incongruous
proposition, to insist, as has been done in some cases, that an
issue of fact, whether a particular bill has been passed by the
Legislature in conformity with the constitutional directions,
can be presented in the final decision of the case on its merits
by the jury.    This would be, in effect, to take from the judge
the right and duty of knowing and declaring the law and con-
ferring it upon the jury.    If any question can arise, whether a
bill has, in fact, become a law, it is a question which addresses
itself solely to the court, to be answered by its judicial knowl-
edge, privileged, undoubtedly, however, to call to its aid such
means of enlightenment and information as may be compati-

ble with judicial discretion, and the proper exercise of judicial functions.

The difficult question still remains for determination, whether, if the court, through its judicial knowledge, or being enlightened by inspection or satisfactory evidence of the contents of the journals of the two houses of the Legislature, is informed that the bill does not appear to have been passed by the Legislature in conformity with all the constitutional directions and requirements, is it the duty of the court, or is the court at liberty, to say that such bill has not become a law, though signed by " the speaker and president of the respective " houses," and verified and apparently consummated by the approval of the Governor ? Beyond question, many courts have held that they may, and jurists of the highest character have sanctioned their conclusions. We are constrained, however, to say that we cannot agree that, either on principles of sound reason or the weight of authority, can it be maintained, that the judicial department, on the bare fact that the journals of one or both houses of the Legislature fail to show the passage of the bill in full and strict conformity to all the directions contained in the Constitution, should disregard and treat as naught an act in all other respects perfect and unobjectionable, as was in effect said by the Superior Court of Ohio (Miller v. The State, 3 Ohio St., 483). We do not say, for we are not called upon in this case to do so, how far the court may be bound by the mere signatures of these officers as conclusive evidence of the alleged law, when the objection presents the question of " the authority in which the law- " making power resides, or the number of votes a bill must re- " ceive to become a law." The power to make law is in the Legislature, and is exercised by the requisite number of members and votes required in the Constitution to pass a particular bill. The signature of its officers and the approval of the Governor cannot, unquestionably, make that law which has not been enacted by the Legislature. They only furnish evidence, conclusive or otherwise, as may be held, of the enactment of the alleged law by the Legislature. And, while we may see great

difficulty as well as danger in holding that the judicial department may go behind the final and concluding if not conclusive evidence provided in the Constitution for authentication of all bills passed by the Legislature, this is altogether a different question from that presented by the proposition that the court may disregard the bill, though passed by the requisite majority, because of some irregularity in some preliminary order of business, or through failure of either house in keeping a full and accurate journal of its proceedings. To do so would, in our opinion, lead to most disastrous consequences. (Cooley, Const. Lim., 191, 192, and cases cited in notes.)

If we were to treat the signature of the speaker and president of the two houses, the approval of the Governor, and the record of the act in the department of State, as merely *prima facie* evidence of its validity, the irregularities or mere omissions shown by the journals, as insisted upon by appellant's counsel, would not warrant the conclusion that it had not been duly and legally enacted by the Legislature. Looking at the journals alone, it can only be said, at most, that there is some doubt whether the act as approved by the Governor had been passed by the Legislature in manner and form as directed in the Constitution. Evidently this would not rebut the presumption in favor of the law from the signature of speaker and president, though no weight should be given to the action of the executive department, whose opportunity of correct information of the action of the Legislature is certainly much better than that of the judicial department, and to whom it is equally as important for the correct discharge of its own constitutional functions and duties.

No principle of law is more clearly or firmly settled than that public or municipal corporations, established for public purposes, such as the administration of local or civil government, are not in the nature of contracts between the State and the corporation, and that their charters may be annulled and revoked at the will and pleasure of the Legislature, as it deems the public good may require. " It is," said Justice Nelson,

42

" an unsound and even absurd proposition that political power
" conferred by the Legislature can become a vested right as
" against the government in any individual or body of men."
(People *v.* Morris, 13 Wend., 325.)   " Public or municipal cor-
" porations are established for the local government of towns
" or particular districts.   The special powers conferred upon
" them are not vested rights as against the State, but, being
" wholly political, exist only during the will of the general Leg-
" islature ; otherwise there would be numberless petty govern-
" ments existing within the State, forming part of it but inde-
" pendent of the control of the sovereign power."   (16 How.,
369.)   Such corporations are the creatures of the State, made
for a specific purpose, to exercise, within a prescribed limit,
powers conferred upon them.

The State may withdraw these local powers of government
at pleasure, and may, through its Legislature, or other ap-
pointed channels, govern the local territory as it governs the
State at large.   It may enlarge or contract its powers or de-
stroy its existence.   (United States *v.* The Baltimore and Ohio
Railroad Co., Wall.)   The Legislature cannot alienate any part
of its legislative power.   " It cannot, therefore," says Shars-
wood, J., " by legislative act or contract invest a municipal
" corporation with irrevocable franchise of government over
" a part of its territory."   (64 Penn. St., 169.)

It necessarily follows from these fundamental and well-
established general principles, that the fact of an existing act
of incorporation, or the failure to submit to the people for
acceptance or rejection the new act of incorporation, in no way
affects the validity of the new charter.   If so, the right and
power of government over so much of the State as is included
in the corporate limits of the city, is vested, not in the Legisla-
ture, but in the local community ; and delegated power will
have become superior to the source from which it derives its
existence ; or the people of a particular locality may dictate
the manner in which the legislative power in their particular
locality shall be exercised.   If, however, assent to the act of

incorporation must be shown, this is sufficiently done by the subsequent organization and continued exercise of the functions conferred by the act.

The rule, however, which applies to private corporations, that the incorporating act must be assented to or accepted before it has any effect, has no application to statutes creating municipal corporations. These, as says Judge Dillon, are imperative and binding without any consent, unless the act is expressly made conditional. (Dill. Municipal Corp., Section 23).

No special authority, it is said, is conferred by the Constitution upon the Legislature to create local municipal corporations, such as cities and towns, and therefore the legislative power to levy taxes, cannot, it is insisted, be conferred upon or delegated to such corporations. It is sufficient answer to this proposition, to say, that the power and authority to create local municipal corporations, though generally mentioned and specially authorized in most constitutions, is an essential incident of and inherent in the grant of legislative power, under our social organization and republican system of government. And while it is a well-recognized rule, that the Legislature cannot delegate its general legislative powers, it is equally well settled, that it may confer on such corporations local legislative power adequate for the purposes of their creation. These propositions are illustrated and supported in cases heretofore referred to.

If, as is urged, the ordinance levying the taxes, about which the present controversy arose, exceeds the legislative power of taxation, or there is a violation of any provision of the Constitution in said ordinance, or in the proceedings authorized by it, for the collection of the taxes levied thereby, to the extent of such conflict it is of course void. The main points urged in support of this objection, seem to be, the want of an assessment by a justice of the peace, and the alleged want of equality and uniformity in the tax. Both of these propositions have been sufficiently discussed in their general aspects in the case of The Texas Banking and Insurance Co. v. The State,

in which suit was brought by the State for the recovery of a similar character of tax.

It may be proper, however, for us to say, that we are not to be understood as holding, that all the taxes levied by this ordinance are warranted by the Constitution. Our decision, on the contrary, is intended to be limited in its application to taxes on occupations, trades and professions. The parties by whom this suit was instituted are unquestionably liable to this character of tax ; if some of the others, who made themselves parties upon the ground of a common interest with the parties bringing the suit, are not, we cannot properly pass upon or determine other questions which may affect them in this case. Equality and uniformity of taxes on occupations, to the approximate extent of which it is reasonably attainable, is required by the Constitution, and is an essential element in the power of taxation. But discrimination in occupations and classifications of them, so far as it has been made to appear to us, seems to be a reasonable and proper rule applied by the Legislature for the purpose of apportioning such taxes with equality and uniformity. Until it is shown that the Legislature has clearly exceeded the limit of their authority and disregarded the restrictions by which it should be controlled, evidently the court cannot interfere.

If the Legislature, or the city, under color of its authority, should plainly disregard the inherent nature of the taxing power and direct constitutional restrictions, and, under color of the taxing power, make palpably discriminating exactions, thereby making, in effect, confiscations, and levying contributions instead of taxes, or departing from the plain constitutional requirement of the taxation upon the property according to its value, and impose heavier burthens on one character of property than on others, by reason of any particular use or purpose to which it is applied, or supposed increase of some particular public burthen or expenditure, such, for example, as keeping in repair roads or streets, it would be the duty of the court on its being properly made to appear to grant appropriate relief.

The objection made to the constitutionality of the Recorder's Court, created by the charter, has been, in effect, answered by what has been heretofore said. If the Legislature may, by reason of its inherent legislative power, create a municipal corporation for purposes of local government, it seems to follow, as a necessary conclusion, that it may invest with such powers as are necessary and essential for the ends and purposes of its creation. Without the grant of general police powers, and the means of enforcing their respect and observance, the act of incorporation of a town or city would be little better than waste paper.

Judicial power of a general character, such as is conferred upon constitutional tribunals, or officers clothed with judicial functions for the general administration of the laws, in contradistinction to local or municipal ordinances and regulations, cannot be conferred upon mere corporation courts created to enforce the police powers delegated to such corporations. This seems to be the extent to which we can certainly say, in the absence of the constitutions and statutes applicable to them, that most of the cases cited by appellant clearly go. Some of them, however, seem to lay down a broader rule. We cannot consent to give the sections of our Constitution, conferring and distributing the judicial power, so limited and technical a construction and application. We think its language, vesting judicial power " in such inferior courts and magistrates as may " be created in this Constitution, or by the Legislature under " its authority," entirely sufficient to warrant the Legislature, when creating municipal corporations, in the absence of any restriction, to create local municipal tribunals as an essential necessity to the well-being of such local municipal corporations. (The State v. Young, 3 Kansas, 445; Hutchings v. Scott, 4 H. (N. J.), 218; Schaffer v.          , 17 Md., 381; 32 Md., 369.)

There being no error in the judgment, it is affirmed.

Affirmed.

(Justice Gould did not sit in this case.)