### ROGERS et al. v. DANIEL OIL & ROYALTY CO.
#### No. 10598.

Court of Civil Appeals of Texas. Galveston.

May 6, 1937.

Rehearing Denied May 27, 1937.

district court of Anderson county, Texas, do issue a temporary injunction, effective from this date until said cause is finally disposed of, restraining the defendants from seizing or selling the trucks of crude petroleum hauled by plaintiff, its agents, servants, and employees, and from selling same for state taxes, and from any manner interfering with its operation, management, and control of its business, and from seizing plaintiff's trucks loaded with crude petroleum, and from molesting, detaining, and complaining against, and interfering with the operation, management, and control of plaintiff's trucks loaded with crude-petroleum, said restraining order to be effective until this cause is finally disposed of, but not restraining defendants from prosecuting plaintiff, its agents, servants, and employees under any criminal laws of the state of Texas."

Considered from its four corners, the sole question the appeal presents is whether that order, which only has the effect of preserving the status quo of the matter in dispute between the parties until a final trial on the merits there, was in the circumstances an abuse of a sound judicial discretion upon the part of the trial court; this court, after hearing the helpful arguments and briefs of able counsel for both sides, is unable to hold that it was, concluding rather that the pleadings and evidence as a whole justified, if it did not compel, the action so taken.

Endeavoring to at once strip the decks down to the actual bone of contention involved, it is deemed sufficient to say that the comptroller—proceeding through his tax supervisor—acting as in pursuance of the new "motor fuel" statute as amended to date, Vernon's Ann.Civ.St. art. 7065a-1 et seq., seized the appellee's truck containing 20 barrels of the product of its wells while being transported by it to the storage tanks of a purchaser thereof from it, under the claim that it constituted "motor fuel" as defined in the cited article, and demanded that appellee then and there comply with the requirements thereof and pay the 4-cent per gallon tax to the state required thereby; on the failure of the appellee, either to concede that its product was such "motor fuel" —it contending that it was merely "crude oil," hence subject only to a 2-cent per barrel tax under Vernon's Ann.Civ.St. art. 7057a, § 2(1)—or to otherwise comply with the requirements of the "Motor Fuel Act," the appellants arrested the appellee's truck

Wm. McCraw, Atty. Gen., and Pat M. Neff, Jr., Asst. Atty. Gen., for appellants.

H. L. Williford, of Fairfield, R. W. Williford, of Wortham, and Cotten & Johnston, of Palestine, for appellee.

GRAVES, Justice.

The appellants (George H. Sheppard, as state comptroller of public accounts, his alter ego, F. A. Bethea, as tax supervisor in his office, and W. G. Rogers, as sheriff of Anderson county) inveigh against a temporary injunction granted the appellee (the Daniel Oil & Royalty Company) by the trial court, after notice and a full hearing on the pleadings and evidence from both sides, the material substance of which is this:

"It is, therefore, ordered, adjudged and decreed by the court that the clerk of the

driver, took possession of its truck and contents, and then proceeded as further prescribed in the statute, until they were subjected to a restraining order from the trial court, which had the same effect as the quoted temporary injunction, up until the time the latter was issued.

As will be noted from its quoted language in granting the writ, the learned trial court must be presumed to have found on the facts—if that be necessary to the upholding of its action—that the product the appellee was so transporting and selling was in fact "crude petroleum," or "crude oil," and not "motor fuel," as the state so contended; as indicated, after the parties had quit jockeying for place through their pleadings, that court covered the entire field of the evidence each side had offered upon the hearing, reaching its conclusion after full consideration thereof.

A statement of facts—reproducing all that evidence here—has been carefully examined on this appeal, and this court is unable to say there was any lack of support for such a finding—rather the contrary, at least to the extent that it was required for the interlocutory action taken; in other words, the evidence clearly seems to have gone far enough to make it reasonably probable that the appellee's product, on final trial on the merits, would be shown not to constitute "motor fuel" as claimed; wherefore, that the acts so committed against it by the appellants would tend to render a final judgment in its behalf—without such meantime restraint—ineffectual.

It would serve no needful purpose to detail, nor even recapitulate, that evidence here; it covers, back and forth, such a range as an inquiry like that would naturally do, but many of the introductory facts leading to it were wholly undisputed; that is, the appellee produced the substance from its two wells in the Freestone county oil field, about 12 miles east of Fairfield, retaining it in its natural state, except that at the surface of the wells it was run through a separator which divided it into two parts—a gas that was sold separately as such to the Lone Star Gas Company, and a liquid that was sold as "crude oil" under a written contract to a Mr. Hunt, at a $1.08 a barrel, a 20-barrel truck load of which constituted the subject-matter of this controversy; no other treatment whatever was given the natural product of the wells and none of this liquid residue that came from the separator was at the time here involved either being sold or used as "motor fuel," but all of it was being so sold and delivered to Mr. Hunt at a stipulated price of $1.08 per barrel, that being "the average of the posted-prices of Humble, Gulf, and Texas Companies over North Texas *crude oil* of 40 deg. A. P. I. gravity prevailing on the date and time of delivery," together with an additional charge of 22 cents per barrel he paid the appellee for transporting it from the latter's wells to his own storage tanks; neither did Mr. Hunt, after so buying and receiving the product, himself sell it for "motor fuel," but mixed it with other "crude oil" or petroleum, and in turn sold it as such; all proper taxes upon it as "crude oil" or "crude petroleum" were being paid, respectively, either by Mr. Hunt or by the appellee, but neither of them had either paid the taxes or met the other requirements for disposing of this residue as "motor fuel," under the statute invoked in this proceeding by the comptroller.

On the direct inquiry as to whether or not this product was properly classable as "motor fuel" under the definition given in the statute relied upon, both sides had samples of it examined and much testimony given as to its nature and content; these versions differed little as to the intrinsic and constituent character of the substance, but did vary somewhat as to opinions on what it should be called and the uses it could be put to; indeed, the only witnesses who testified as expert petroleum chemists, or engineers, unequivocally classified it as "crude petroleum," while every one of the appellants' witnesses who designated it as "motor fuel" —even their pharmaceutical graduate chemist, Mr. LeMay—not only first expressly disclaimed that he was a petroleum chemist, or engineer, but further agreed with all of those for the appellee in their several statements that it was unfit for any proper, continued and practical use as a motor fuel in automobiles; indeed, Mr. LeMay himself summed up the consensus of all the evidence on that point in this way:

"Crude oil can be used as a motor fuel. There is no doubt about that. It has been used. * * *

"Crude petroleum could be used in certain types of automobiles, but it would cause overheating. As to whether it would injure the motor, that would depend on who was using it and how it was used. You would

probably have some trouble starting the motor on a cool morning, and if you tried to drive at a high speed, you would get a great deal of knocking. * * *

"On continued use this substance would probably damage a motor vehicle. I think it would injure the motor if continuously used. * * *

"It would probably hurt the present high-speed motors. * * *

"The opinion I have expressed is not only my opinion, but is the opinion of others who are considered to be experts along mechanical lines—automobile mechanics."

 This brings us to the application of what seems to be the well-defined law in Texas ruling a specific judicial action like the one taken here; that is, under such authorities as article 5, section 8, of our Constitution, R.S. art. 4642, and holdings of our courts of last resort, like those in City of Dallas v. Wright, 120 Tex. 190, 36 S.W. (2d) 973, 77 A.L.R. 709, and Anderson, Clayton & Co. v. State, 122 Tex. 530, 62 S.W.(2d) 107, the district courts may so temporarily preserve the status quo of the subject-matter in litigation until a final trial on the merits, as was done in this instance, in order either that the property may still remain subject to the orders of the court, or that some wrongful act that would tend to render its final judgment ineffectual may be prevented; that what was done in this cause brings it squarely under the general principles so stated is not doubted; neither would there seem to be any doubt that this further principle is—perforce of the facts recited—applicable here, that equity will come to the rescue of one under duress because of a void act, which is exemplified by the Supreme Court of Indiana in State Board v. McDaniel, 199 Ind. 708, 160 N.E. 347; see, also, these further authorities: Blessing v. Galveston, 42 Tex. 641; George v. Dean, 47 Tex. 73; Morris v. Cummings, 91 Tex. 618, 45 S.W. 383; Lively v. Missouri, K. & T. R. Co., 102 Tex. 545, 120 S.W. 852; McCallum v. Associated, etc., Men (Tex.Civ.App.) 26 S.W.(2d) 715.

The act of this comptroller was certainly a void administrative order, if the oil he so peremptorily seized from the appellee was not a "motor fuel" within the purview of the law under which he acted, and as indicated, supra, the trial court has determined, prima facie at least, from the greater weight, if not indeed from the conclusive purport, of the testimony, that it was not.

Perhaps Victor Hugo did not picture a more faithful limb of nor persistent inquisitor for the law in Javert than the tax supervisor here, Mr. Bethea, thus frankly testified he would in reality have been in this instance, but for the restraining arm of the trial court:

*"It is not necessary to have a Comptroller's manifest, unless the substance he is hauling is motor-fuel.*

*"Mr. Daniel would not have been violating any law by not having a Comptroller's manifest, if the substance is not a motor-fuel.*

"I arrested Mr. Daniel, held him in custody, caused him to make bond, and impounded his truck.

"Except for this injunction, if Mr. Daniel should again haul a similar product over the highway from the lease to Tucker, I would arrest him.

"If he moved the same substance again, I would have him arrested, and if he did not make bond, place him in jail.

"I will take possession of his truck and hold it unless he sues out some other writ according to law. I will do that every time he moves a load of oil, if this restraining-order is dissolved. I will place him in jail every time, take possession of his truck every time, for the purpose of collecting the 4¢ motor-fuel tax.

*"The tax on a barrel of motor-fuel would be $1.68.*

*"If Mr. Daniel is selling this substance for $1.08, he would lose 60¢ a barrel, if he paid the tax."*

Not only that, but from him came also—in the same open way—the italicized admissions from the appellants' side of this controversy that, if the seized product was not a "motor fuel" within the meaning of the statute he was acting under, its exaction by him was not only (1) wholly without authority of law, but (2) emphatically confiscatory as well.

 But, as against the visitation upon himself in this proceeding of these express grants of power to the courts from both Constitution and enabling act to afford injunctive relief—especially on interlocutory hearing—in a proper case under the principles of equity, the comptroller invokes what is termed the "suspense statute," Vernon's Ann.Civ.St. art. 7057b, providing for the payment of license or privilege taxes under protest in certain circumstances, which is likewise a newcomer to our juris-

prudence; in the first place, it is thought that enactment—which the litigants here state has never been passed upon nor construed by a published appellate court opinion in Texas—may not override this pre-existing constitutional power in our courts to so issue writs of injunction, particularly in an instance like this, where the court has only preliminarily acted and that against an administrative order of a state official it has, in effect, already held to be without authority of law and void; if that bar were not in the way, in the next place, it has at least not been made to appear in this record that such "suspense statute" would either make this appellee whole, or afford him a full, complete, and adequate remedy, in lieu of a temporary stay of the enforcement of what the trial court has found to be an unauthorized tax; in Atlantic Coast Line R. Co. v. Doughton, 262 U.S. 413, 43 S.Ct. 620, 67 L.Ed. 1051, 1061, a case involving a similar statute, the United States Supreme Court held that in the absence of a construction and application of that statute by the highest court of the state, it could not say the remedy at law thereby provided was plain and adequate; furthermore, since the "motor fuel" law here under review provides that the proceeds of the sale for these 4-cent per gallon taxes shall be applied, first, to the payment of the tax, second, to the expenses of the sale, and, third, the balance, if any, to be paid to the taxpayer, it seems to clearly follow that this appellee —had his product been sold under that law —would not have been able to recover the taxes the sheriff would have paid into the state, except by an act of the Legislature, and then only the price its product brought after deducting quite heavy expenses that evidently would have been incident to such a sale of it.

The inadequacy of the "suspense statute" seems quite probable in a number of other particulars, in that it apparently would afford the appellee no compensatory interest on the real value of his product for the full time involved, nor any adequate method of reimbursement for the substantial premiums he would have been compelled to pay to a corporate surety for making a bond for him, and others; but since further discussion would extend this opinion too far, it is foreborne.

On the considerations indicated, together with others that might have been stated, the judgment will be affirmed.

Affirmed.